Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
08/01/2023 09:07 AM CDT

- 98 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
IN RE INTEREST OF JESSALINA M.
Cite as 32 Neb. App. 98

In re Interest of Jessalina M.,
a child under 18 years of age.
State of Nebraska, appellee, v.
Samantha M., appellant.

___ N.W.2d ___

Filed July 18, 2023.    No. A-22-678.

1. **Juvenile Courts: Appeal and Error.** An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below.
2. **Juvenile Courts: Evidence: Appeal and Error.** When the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another.
3. **Parental Rights: Proof.** Neb. Rev. Stat. § 43-292(7) (Reissue 2016) operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent.
4. **Parental Rights: Time.** The filing of the petition, supplemental petition, or motion to terminate parental rights is the triggering event for the 22-month look-back period described in Neb. Rev. Stat. § 43-292(7) (Reissue 2016).
5. **Parental Rights: Proof.** Under Neb. Rev. Stat. § 43-292 (Reissue 2016), once the State shows that statutory grounds for termination of parental rights exist, the State must then show that termination is in the best interests of the child.
6. **Parental Rights: Presumptions: Proof.** A child's best interests are presumed to be served by having a relationship with his or her parent. This presumption is overcome only when the State has proved that the parent is unfit.
7. **Parental Rights: Statutes: Words and Phrases.** Although the term "unfitness" is not expressly stated in Neb. Rev. Stat. § 43-292

- 99 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
IN RE INTEREST OF JESSALINA M.
Cite as 32 Neb. App. 98

(Reissue 2016), it derives from the fault and neglect subsections of that statute and from an assessment of the child's best interests.

8. **Parental Rights.** Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable period of time, the child's best interests require termination of parental rights.

Appeal from the County Court for Cheyenne County: Russell W. Harford, Judge. Affirmed.

Gregory A. Rosen for appellant.

Amber Horn, Chief Deputy Cheyenne County Attorney, for appellee.

Audrey M. Long, guardian ad litem.

Riedmann, Bishop, and Arterburn, Judges.

Bishop, Judge.

## I. INTRODUCTION

Samantha M. appeals the order of the county court for Cheyenne County, sitting as a juvenile court, terminating her parental rights to her daughter, Jessalina M. We affirm.

## II. BACKGROUND

### 1. Procedural Background

Samantha is the mother of Jessalina, born in September 2020. Jose M. is Jessalina's father. Jose was part of the juvenile proceedings below, but he made significant progress on his case plan and was able to be reunified with Jessalina. Because Jose is not part of this appeal, he will only be discussed as necessary.

Jessalina was removed from Samantha's care shortly after Jessalina's birth due to concerns about the child's well-being. Hospital staff had been concerned about Samantha's behaviors, which included yelling and screaming at staff; her initial refusal to sign a treatment order for Jessalina; and Samantha's history of mental health issues. Additionally, Samantha previously had her parental rights terminated to her son, Noah C.,

- 100 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
IN RE INTEREST OF JESSALINA M.
Cite as 32 Neb. App. 98

in August 2019, and that termination was affirmed on appeal. See *In re Interest of Noah C.*, 306 Neb. 359, 945 N.W.2d 143 (2020). Jose is not Noah's father. Because Noah is not part of this appeal, he will only be discussed as necessary.

(a) Lincoln County Proceedings

On September 10, 2020, the State filed a petition in the county court for Lincoln County, sitting as a juvenile court, alleging that Jessalina was a child within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) because she was in a situation dangerous to life or limb or injurious to her health or morals. That same day, the juvenile court entered an "Order of Detention" giving temporary custody of Jessalina to the Nebraska Department of Health and Human Services (DHHS). Jessalina was placed in foster care, where she remained until on or about January 10, 2022, at which time she was placed with her father, who by that time had made significant progress on his case plan.

On September 14, 2020, the juvenile court appointed counsel to represent Samantha, and a guardian ad litem (GAL) for Jessalina. After a motion by the State noting Samantha's history of mental health issues, the court also appointed a GAL for Samantha.

On October 13, 2020, Jessalina was adjudicated to be a child within the meaning of § 43-247(3)(a) based on her father's answer of "no contest" to the allegations in the petition. Following a disposition hearing on November 24, the juvenile court adopted the DHHS case plan of November 17 and all parties were ordered to comply with the terms of that plan; the terms related to Jose and Jessalina, not Samantha.

On January 6, 2021, Samantha entered her "[n]o contest" answer to the allegations in the petition, and Jessalina was once again adjudicated to be a child within the meaning of § 43-247(3)(a).

Following a disposition hearing on February 24, 2021, the juvenile court adopted the DHHS case plan of February

- 101 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
IN RE INTEREST OF JESSALINA M.
Cite as 32 Neb. App. 98

17 and ordered all parties to comply with the terms of the respective plan. By a separate journal entry and order entered on March 8, the juvenile court ordered that a concurrent plan of adoption be redacted from the February 17 case plan.

The February 17, 2021, case plan set forth three goals and numerous strategies to achieve those goals. The first goal was for Samantha to "provide a safe and healthy environment for her child that promotes emotional and physical well being on a consistent ongoing basis." The strategies set forth for Samantha were to work on her parenting skills to meet Jessalina's needs on an ongoing basis; respond to Jessalina's needs on cue and without prompt; learn to control her anger and not yell around Jessalina and demonstrate that on an ongoing basis, as well as learn to be open to family support giving her "attitude checks" and to be open to follow feedback regarding why an attitude check was called; work with service providers to understand Jessalina's needs and how to meet them and demonstrate the ability to do that on an ongoing basis; attend visits as scheduled and not have them ended due to becoming upset, threatening others, or not meeting the needs of the child, and to communicate with family support if she was running late; cooperate in assessments requested regarding her mental health and/or parenting and sign releases to provide DHHS information regarding the assessments; and utilize appropriate coping skills gained in counseling when dealing with any stressors.

The second goal was for Samantha to "manage her anxieties, trauma, and mental health as evidenced by attending her medical appointments, managing her moods, handling stressful situations, communicating effectively, and participating in everyday activities." The strategies set forth for Samantha were to sign releases for DHHS to "any and all doctors or service providers that she [was] working with regarding her mental health, medication management, and neurologist"; participate in a psychological evaluation and follow the recommendations; find and maintain employment to provide for

- 102 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
IN RE INTEREST OF JESSALINA M.
Cite as 32 Neb. App. 98

herself and her daughter; maintain suitable housing for herself and her daughter; take her medications as prescribed and attend her medication management appointments; learn what her diagnosis is and how it affects her on a day-to-day basis, as well as how it affects her parenting; work with her service providers to learn how to manage her mental health to parent her child, meeting her emotional and physical well-being, and demonstrate that ability consistently for a minimum of 6 months; and control her emotions and communicate rationally without yelling and becoming verbally aggressive.

The third goal was for Jessalina to "have a safe and stable home provided for her where her physical and emotional needs are consistently met." The strategies set forth for Samantha were to attend visits with Jessalina and meet her physical and emotional needs during the visits, obtain employment to provide for Jessalina's needs, and maintain suitable housing.

The goals and strategies from the February 2021 case plan remained the same throughout the entirety of this case.

On April 29, 2021, Samantha's counsel filed a motion to withdraw, stating that "[Samantha] has expressed that she would like different representation, and there has been a break down in the attorney-client relationship." At a hearing on May 4, counsel stated that Samantha expressed a desire for different or more effective representation. Samantha's GAL stated that Samantha was getting excellent counsel and that it would not be in Samantha's best interests to allow counsel to withdraw. Following the hearing, the juvenile court denied counsel's motion to withdraw, but it did appoint cocounsel to represent Samantha.

A review hearing was held on May 11, 2021. Samantha objected to DHHS' May 4 court report and case plan, which once again included a concurrent plan for adoption. An evidentiary hearing was set for June 30.

On June 17, 2021, Jessalina's GAL filed a motion to transfer the case to Cheyenne County pursuant to Neb. Rev. Stat. § 43-282 (Reissue 2016). The GAL alleged that

- 103 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
IN RE INTEREST OF JESSALINA M.
Cite as 32 Neb. App. 98

Samantha moved to North Platte, Nebraska (Lincoln County), from Sidney, Nebraska (Cheyenne County), shortly before Jessalina's birth; Jessalina was born in North Platte in September 2020, and the juvenile petition was filed in Lincoln County on September 10; Jessalina's foster parents (with whom she was placed the day she was released from the hospital after her birth) lived in Sidney; Jose had always lived in Sidney; Samantha and Jose had a divorce action pending in Cheyenne County; all visits by both parents occurred at locations outside of Lincoln County, with a majority occurring in Sidney; all witnesses who had been directly involved with Jessalina for any hearing occurring in this matter, with the exception of Samantha, were located in either Keith County or Cheyenne County; and Cheyenne County was the most convenient forum. The notice of hearing stated that the motion would be heard on June 22.

On June 18, 2021, Samantha filed a motion to continue the hearing on the GAL's motion to transfer. Samantha stated in part that she was currently awaiting a contested hearing scheduled for June 30 concerning her objections to a case plan that was offered at a hearing on May 11. She claimed that she would be

> unduly prejudiced by a decision to transfer this case at any time but she will be severely prejudiced by having the motion heard and potentially decided prior to her previously scheduled hearing on June 30, 2021[,] which could result in a continuance of that hearing and new counsel being appointed in the county the case is transferred to.

Following a hearing on June 22, 2021, the juvenile court, on its own motion, postponed the contested court report and case plan hearing scheduled for June 30, and stated that the contested motion to transfer would be heard that day instead.

At the June 30, 2021, hearing on the motion to transfer, the juvenile court stated that Jessalina's GAL was excused from the hearing but was authorized to present evidence by

- 104 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
32 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF JESSALINA M.
Cite as 32 Neb. App. 98

affidavit. Exhibits were then received, and arguments were made. We will set forth the details as necessary later in our analysis. The juvenile court entered its order on July 2, transferring the matter to Cheyenne County; it also deferred the contested review hearing on the May 4 court report and case plan to Cheyenne County.

(b) Cheyenne County Proceedings

On August 13, 2021, the county court for Cheyenne County, sitting as a juvenile court, set Samantha's objection to the May 4 court report and case plan for hearing on September 21.

On September 7, 2021, Samantha's court-appointed counsel in Cheyenne County filed a motion to withdraw, stating that she had been "fired" by Samantha, who felt counsel was ineffective and not representing her properly. The juvenile court granted the motion and appointed new counsel the same day.

Following the hearing on Samantha's objection to the May 4, 2021, DHHS court report and case plan, the juvenile court entered an order on September 27, modifying the May 4 report "to eliminate Adoption as an alternative to reunification at this time" and approving the court report and case plan "as modified." The goals and strategies for Samantha otherwise remained the same.

On October 22, 2021, the juvenile court granted Samantha's motion to hire an expert in psychology to assess whether her mental health needs rose to a level of disability that may require special accommodations; Dr. Gage Stermensky was to be the expert. On November 2, Jessalina's GAL filed a motion to update Samantha's psychological evaluation, noting that it had been a year since Samantha's previous psychological evaluation. Following a hearing, the court granted the GAL's motion and ordered Samantha to obtain an updated psychological evaluation by Dr. Stermensky, with the results to be provided to the parties, except the father and his attorney. Samantha was also ordered to sign all psychological and medical releases.

- 105 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
IN RE INTEREST OF JESSALINA M.
Cite as 32 Neb. App. 98

On November 30, 2021, the juvenile court approved the November 2 court report and case plan over Samantha's objections. The goals and strategies for Samantha remained the same.

On January 14, 2022, the State and Jessalina's GAL filed an emergency motion to suspend visitations with Samantha and Jessalina. The motion alleged as follows: Since the end of December 2021, Samantha refused to participate in visits. A safety threat existed for Jessalina and "FSWs" (family support workers) to provide coverage of Samantha's visits because (1) at the last visit in December, law enforcement was summoned due to Samantha's behavior, including her refusal to return Jessalina to the family support provider and physically restraining Jessalina when the visit was ended; (2) Samantha had a friend stalk a family support worker and then verbally threaten the present worker, including threats of physical harm; (3) the family support worker resigned from the case due to Samantha's threats and behaviors; and (4) this was the fourth family support worker to terminate services with Samantha due to her behaviors. Following a hearing, the juvenile court entered an order on February 2, 2020, granting the motion to suspend visits and stating that no further in-person visitations would be provided until Samantha submitted to an evaluation by Dr. Stermensky and his report was filed with the court; pending the evaluation and receipt of the report, Samantha was to be provided video visitation with Jessalina.

On February 14, 2022, Samantha filed a motion to reconsider that, in part, sought a different psychologist to complete her updated psychological evaluation, because Dr. Stermensky had previously completed Jose's evaluation "and this causes concern given the relationship between the two parties." Following a hearing, the juvenile court granted Samantha's request to have an updated psychological evaluation by a licensed psychologist other than Dr. Stermensky, because of

- 106 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
IN RE INTEREST OF JESSALINA M.
Cite as 32 Neb. App. 98

the potential conflict of interest. The court said, "It makes the most sense to the Court that Dr. Kimzey . . . do the updated evaluation because he did the first psychological evaluation," but that Samantha and her counsel could choose a psychologist from a specified list.

On March 25, 2022, the State and Jessalina's GAL filed a "[c]omplaint" to terminate Samantha's parental rights to Jessalina pursuant to Neb. Rev. Stat. § 43-292(2), (3), (5), (6), and (7) (Reissue 2016). The motion alleged that Samantha substantially and continuously or repeatedly neglected and refused to give Jessalina necessary parental care and protection; Samantha, being financially able, willfully neglected to provide Jessalina with the necessary subsistence, education, or other care necessary for her health, morals, or welfare or neglected to pay for such subsistence, education, or other care when legal custody of Jessalina was lodged with others and such payment ordered by the court; Samantha was unable to discharge parental responsibilities because of mental illness or mental deficiency, and there were reasonable grounds to believe that such condition would continue for a prolonged indeterminate period; reasonable efforts to preserve and reunify the family failed to correct the conditions leading to the adjudication of the child under § 43-247(3)(a); Jessalina had been in an out-of-home placement for 15 or more months of the most recent 22 months; and termination of Samantha's parental rights was in the best interests of the child.

## 2. Parental Termination Hearing

The parental termination hearing was held on July 20 and August 12 and 19, 2022. Samantha was allowed to appear virtually; she was always represented by counsel, who appeared personally, as did Samantha's GAL. The State called several witnesses to testify, and numerous exhibits were received into evidence. Samantha did not testify, but two witnesses testified on her behalf.

- 107 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
IN RE INTEREST OF JESSALINA M.
Cite as 32 Neb. App. 98

### (a) Prior Parental Termination

Sonya Oliverius, a DHHS child family services supervisor, testified that she was the one who removed Noah from Samantha's care in December 2017 and then supervised that case for its entirety. Noah was 4 or 5 years old at the time of his removal. DHHS ultimately recommended terminating Samantha's parental rights. Oliverius stated, "We had worked a case with [Samantha] for quite some time with case plan goals," but "[w]e were not able to make enough progress with [her] in regards to mostly her mental health," "[a]nd so we did not feel that she could provide a safe and emotionally stable environment for Noah." DHHS never knew exactly what Samantha was diagnosed with, but she "sporadically talked about different things, PTSD being one of the biggest concerns that had been brought up." Samantha would not sign releases for anything from the past and never completed requested psychological evaluations. She also did not complete a parenting capacity assessment. Samantha "questioned anyone and everyone that was, essentially, on her case," and it got to the point where there was not a visitation provider who wanted to work with her.

During Noah's case, his father (not Jose) reported to DHHS that he was concerned with continuing his involvement with Noah due to actions by Samantha, including concerns of false allegations of domestic violence, and that he almost lost his job because Samantha showed up at his work. Samantha and Noah's father ultimately had their parental rights terminated in August 2019.

### (b) September 2020 Removal of Jessalina

Jenna Odell is a child and family services specialist with DHHS in North Platte and does initial assessments. Odell testified that when Jessalina was born in September 2020, there were concerns about Samantha's behavior at the hospital, as well as her mental health; the doctor who oversaw Samantha's prenatal care and delivered Jessalina was

- 108 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
IN RE INTEREST OF JESSALINA M.
Cite as 32 Neb. App. 98

concerned about Jessalina leaving the hospital with Samantha and thought Samantha needed a "psych eval." Hospital progress notes indicate that Samantha was "yelling and screaming at staff as well as initially refusing to sign consent to treat the infant" (she later signed the consent), she was "easily frustrated," and there was a lack of information on where an older sibling was located; thus, a report was made to the "abuse and neglect hotline."

Odell met Samantha at the hospital on September 9 and 10, 2020. Odell said Samantha was "dismissive like nothing's wrong" and she accused nurses of "lying about stuff" on a few occasions. Samantha told Odell that she was not currently participating in counseling; she said she had done so with Noah, but it did not help. Samantha was taking medication as prescribed by her physician for her mental health, some of which had to be changed or withheld during pregnancy but resumed following Jessalina's birth. Samantha talked about the domestic violence between Jose and her and stated that was the reason she had moved to North Platte. Samantha would not allow Odell to do a walk-through of her home or even give Odell her address because "she was very paranoid that somebody would get the address and give it to [Jose]." Additionally, Samantha would not give Odell the names of her friends who were her support persons so that Odell could speak with them. According to Odell, Samantha "scored high" on a risk assessment tool and it did not seem like she had addressed concerns since Noah's case the year prior. Odell spoke to Jose over the phone on September 9 and 10, and he was concerned for Jessalina. He told Odell that there was a current protection order that Samantha had against him, but that he had never assaulted Samantha and that she was the aggressor.

Odell stated that Jessalina was made a state ward on September 10, 2020, and placed in a kinship foster home in Sidney where Noah lived. Odell did a referral for Samantha and Jose to have supervised visitation with Jessalina and

- 109 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
IN RE INTEREST OF JESSALINA M.
Cite as 32 Neb. App. 98

provided Samantha with gas and hotel vouchers as well. Samantha's referral was for 25 hours of supervised visitation with Family 4ward in Sidney. Odell transferred the case to a specialist in October.

### (c) Caseworker October 2020
### Through August 2022

Catherine Ruiz is a DHHS child and family services specialist who was the caseworker on this case from October 2020 through the parental termination hearings. She described Samantha's inability to meet Noah's needs, and when asked if Samantha's mental health was an issue in Noah's case, Ruiz responded, "Yes." According to Ruiz, Jessalina was removed from parental care on September 10, 2020, and was placed with her father in January 2022; Jessalina has never been placed back with Samantha. Samantha's visits with Jessalina were supervised for the entire case.

Ruiz testified that Samantha was court-ordered to undergo a psychological evaluation in this case. She completed an evaluation with "Dr. Kimzey, PhD." in November 2020. The evaluation indicates that Samantha reported that the assessment was not court ordered. She was diagnosed with "Attention-deficit/hyperactivity disorder, Combined presentation," "Posttraumatic stress disorder," and "Generalized anxiety disorder." It was also noted that an alternative diagnosis was being considered, "Rule Out: Unspecified Bipolar Disorder." Outpatient counseling was recommended, as well as a psychiatric medical consultation. Ruiz testified that the submitted exhibit contained only a portion of Dr. Kimzey's report, as that was all that was provided to DHSS because "Samantha did not want us to know about her trauma" or "previous history." Ruiz did not believe that any of the information related to the psychological evaluation was comprehensive enough to be valid, and she was concerned that all the information provided to Dr. Kimzey came solely from Samantha; Ruiz did not believe that Samantha was an accurate reporter. Later in the

- 110 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
IN RE INTEREST OF JESSALINA M.
Cite as 32 Neb. App. 98

case, Samantha was ordered to obtain an updated evaluation, but, to Ruiz' knowledge, Samantha had not done so by the time of the termination hearing.

The DHHS case plan goals and strategies, as set forth previously, were adopted by the juvenile court and remained the same throughout the entirety of the case. According to exhibits received into evidence, DHHS provided numerous services to Samantha, including family support with two different agencies, supervised visitation with three different agencies, makeup visitation, "Zoom" visits, home visits, case management, team meetings, medical consultations, urgent needs assessment, counseling, psychological evaluations, hotel vouchers, gas vouchers, and transportation. Ruiz stated that Samantha did not utilize all the services provided to her, and it inhibited her ability to achieve reunification. Samantha had attended parenting classes early in the case.

Ruiz said that DHHS also tried to help Samantha with time management, provided her with a watch, talked to her about using "apps" on her phone, switched visitation times to be later in the day, and extended how late she could be for a visit. DHHS accommodated Samantha's dog, which she said would indicate to her when she was going to have a seizure, as Samantha reported having epilepsy. DHHS also accommodated Samantha with breaks to help her with her anxiety.

Ruiz was questioned about Samantha's progress on the DHHS case plan goals and strategies. Samantha was supposed to attend visits as scheduled, communicate with family support if she was running late, and not have visits ended due to becoming upset, threatening others, or not meeting the needs of the child. Ruiz stated Samantha's progress was "minimal," because she was not attending visits on a regular basis and communicating with workers was an issue. When asked if Samantha made sufficient progress on the goals in order to reunify with Jessalina, Ruiz said, "No."

When Samantha had visits, she provided for Jessalina's physical needs, "but due to the inconsistencies of visitation

- 111 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
32 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF JESSALINA M.
Cite as 32 Neb. App. 98

that was a problem." There was minimal progress on responding to Jessalina's needs on cue without a prompt because Samantha had a hard time understanding Jessalina's cues. Samantha was supposed to learn to control her anger and not yell around Jessalina, and she was supposed to be open to family support workers giving her attitude checks. But again, there was minimal progress because Samantha did not want family support workers to give her any feedback and when they gave her an attitude check, she would get upset. There was an incident in December 2021 when law enforcement was called and Samantha was yelling while holding Jessalina. Samantha did not want to take any direction from providers and "didn't want anybody else to tell her what to do"; this inhibited her ability to learn and apply new parenting skills. Ruiz stated that Samantha attended counseling, but if Samantha became upset, "she would just explode as opposed to trying to use some of the coping skills she claimed to be gaining during counseling."

In her case plan, Samantha was supposed to work with her service providers to learn how to manage her mental health, to parent her child to meet her emotional and physical well-being, and to demonstrate that ability consistently for a minimum of 6 months. Ruiz stated that DHHS did not have any information on whether Samantha was doing these things, and thus her progress was "minimal." Ruiz said that Samantha signed a limited release for her counselor to provide dates of appointments attended and recommendations. But when DHHS reached out to the counselor, DHHS was not given information on recommendations because the counselor said that Samantha did not want her to provide that information. Samantha was supposed to sign releases for DHHS to doctors or service providers she was working with regarding her "mental health, medication management, and neurologist," but Ruiz stated that "we had limited releases, so we still didn't have much information." DHHS knew that Samantha took medication and carried it with her, but "[w]e didn't

- 112 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
32 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF JESSALINA M.
Cite as 32 Neb. App. 98

know what was prescribed or if she was regularly seeing her medication management doctor." Samantha was supposed to learn what her diagnosis was and how it affected her on a day-to-day basis, as well as how it affected her parenting, but Samantha's progress was minimal in that she said she had "a lot of trauma and triggers," but made "it a responsibility for everybody else to walk on eggshells" as opposed to her "taking accountability for her own trauma and triggers."

According to Ruiz, Samantha's progress was also "minimal" regarding controlling her emotions and communicating rationally without yelling or becoming verbally abusive. Ruiz explained that "we would constantly get rude [and vulgar] e-mails and text messages from her when things were not going her way or she was upset about something." Samantha yelled and became verbally aggressive in phone calls, team meetings, and court hearings.

As for maintaining employment, Ruiz said, "I know Samantha had a job, and then she didn't have a job," and then "she wouldn't report anything to [DHHS], so we weren't sure whether she had a job or not." Samantha did have suitable housing in North Platte.

Ruiz never felt that it would be safe for Samantha to have unsupervised visits with Jessalina due to Samantha's mental health not being addressed, and when attempting to address it with Samantha, "she would just become very upset" and say that there were "other factors that were causing her to be this way and that we just didn't understand and that we . . . didn't know our jobs."

Ruiz testified that Samantha worked with several different providers in this case but did not maintain relationships with any of them. Samantha went through three different visitation companies, family support was provided by two different companies, and she had a family coach/community support. According to Ruiz, the providers left the case because Samantha was rude to them either in person or via text or email, and because "overall it was just draining for them,

- 113 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
32 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF JESSALINA M.
Cite as 32 Neb. App. 98

and nobody wanted to work with her." Ruiz and her supervisor also received rude emails from Samantha who called them names and said they were kidnappers.

Supervised visits changed locations several times to accommodate Samantha. Ruiz stated that supervised visits initially occurred 3 or 4 days each week in Sidney, and Samantha would stay in a hotel. But then in March 2021, Samantha obtained a letter from her counselor stating that Sidney was a trigger for Samantha due to trauma. Samantha wanted the visits to happen in North Platte so that she would not have to travel, but DHHS was concerned that Jessalina would have to travel that much (4 hours round trip). Visits were subsequently changed so that they occurred in Chappell, Nebraska, and Ogallala, Nebraska. However, Samantha was not consistent with her visits in Ogallala, and DHHS was losing providers. Samantha started getting scheduled for one of her visits each week in North Platte beginning in July, but Samantha did not like the office location of the North Platte visits and missed a lot of those visits, meaning that Jessalina was traveling for visits that did not occur. Visits went back to being solely in Ogallala in December.

Ruiz did not believe there was a beneficial relationship between Samantha and Jessalina. Ruiz acknowledged that Jessalina was a happy child and was even happy at visits with Samantha. Ruiz did not question the fact that Samantha loved Jessalina but said that Jessalina was "not gaining anything" from the relationship. When Samantha was having an in-person visit, there was some improvement in her parenting skills, and she enjoyed reading to Jessalina. But redirection continued to be a problem, something that was also a problem in Noah's case. Samantha's attendance at visits was not consistent, and for several months, Samantha had been limited to virtual visits due to the lack of an updated psychological evaluation. Ruiz believed there was a risk of harm to Jessalina if Samantha had continued contact with her, because Jessalina's needs would not be met. Ruiz stated, "[I]t has been about

- 114 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
IN RE INTEREST OF JESSALINA M.
Cite as 32 Neb. App. 98

Samantha this whole time . . . . It's always been about her and whether things benefit her." Ruiz worried that Jessalina would not get her needs met if Samantha was "upset with a provider or something was said that she did not like." Ruiz supported terminating Samantha's parental rights to Jessalina because "it would allow Jessalina to have the permanency she deserves," and Ruiz believed that termination of Samantha's parental rights was in Jessalina's best interests.

### (d) Visitation Providers

#### *(i) September 2020 to February 2021*

Janet Vath is the "COO" of Family 4ward, a company that contracts with the State to provide supervised visitation and family support. Vath testified that Family 4ward started visits with Samantha and Jessalina when the child was 2 or 3 days old and continued to do so for 6 to 8 months. Samantha traveled to Sidney 3 or 4 days per week for visits and each visit was 7 or 8 hours long. Vath personally supervised some of the visits when "Samantha would allow me to do them," but if Vath made a decision to cancel a visit if Samantha was late, "then [Samantha] would get mad at me, and then she wouldn't want to see me for a while." Several different visitation workers were assigned to this case because "Samantha was very difficult to get along with"; she would work with someone for a while and then would get mad at that worker, so a different worker would be assigned. Vath testified that "when I finally gave the case back, my providers were all threatening to quit . . . if they had to do any more visits with Samantha." Vath stated that her company had previously provided supervised visitation and family support to Samantha in Noah's case, but "it ended up kind of not in a very good situation" for the same reasons—she was difficult to work with and workers did not want to work with her anymore.

Vath testified that initially Samantha did a "really good job" in Jessalina's case, but as time went on she "started in her old behaviors, her old patterns." Vath tried to address

- 115 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
IN RE INTEREST OF JESSALINA M.
Cite as 32 Neb. App. 98

the situation with Samantha, but Samantha "would just blow up." When Jessalina was 3 or 4 months old, Samantha would talk about how pizza was Jessalina's favorite meal; at 6 months old, Samantha was going to let Jessalina go down the stairs in the playpen; Samantha did not want anybody to watch her give Jessalina a bath; when Jessalina would not go to sleep, Samantha would get irritated with her and just tell her, at 6 months old, "you need to go to sleep." Samantha would not take redirection, and the workers never knew if she was going to get mad, because "she could go from zero to ten in two seconds." When Samantha was told something that she did not want to hear, she could become explosive.

Vath stated that during one visit, Samantha got mad and would not hand Jessalina over to the worker, and Family 4ward's "CEO" was called. The whole time that Samantha was on the phone with the "CEO," the worker was on the phone with Vath. The worker was concerned because Samantha kept "kicking and hitting at [her] dog" while holding Jessalina. There were other visits when Samantha got mad and would "go out and kick the dog," or "hit the dog." Toward the end of Family 4ward's time on the case, the company sent two visitation workers to visits.

Vath agreed that Samantha could be a good mother who was attentive and who communicated and interacted with her child. However, Samantha could also be distant, sitting and watching her child, but not interacting with her. Visitation notes from Family 4ward for December 2020 through February 2021 revealed the following: Samantha often focused on things other than Jessalina and got upset with workers; she was negative toward people who tried to help her and focused her energy on being angry rather than accepting assistance (e.g., getting help with setting up an account to apply for food stamps); and she would not regulate her emotions. The visitation notes also indicated that when Jessalina was 3 months old, Samantha once yelled at her for spitting up, was angry that Jessalina would not respond when asked what the green

- 116 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
32 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF JESSALINA M.
Cite as 32 Neb. App. 98

stripe on her diaper meant, and thought that Jessalina should already be walking. When Jessalina was 4 months old, Samantha was trying to teach her how to meditate and got frustrated when she cried or would not sleep when she was "'supposed to.'" The visitation reports also noted that it appeared Samantha wanted Jessalina to thrive and grow, would feed and change her, and would hold and talk to her.

### (ii) June to November 2021

According to Sarah Jones, deputy programs director at Independence Rising, the company supervised Samantha's visits with Jessalina from June through November 2021. Samantha asked that the company's first supervision worker be removed, so a second worker was assigned. The company ultimately chose to end services with Samantha due to "numerous no-shows from Samantha" and inappropriate ways that Samantha would speak to workers. Jones testified that Samantha used "[v]ery volatile language, a lot of swearing, screaming at us on the phone." Jones explained that Samantha was upset because "she was more than 15 minutes late to her visit, so the visit was ended, and that she thought that we . . . should be held in contempt of court."

Jones sent an email to DHHS on December 3, 2021, informing DHHS of the reasons why the company was no longer willing to supervise Samantha's visits. Samantha was to receive 18 hours of supervised visitation each week. She "no showed" for two visits in June, six in July, one in August, four in September, four in October, and two in November— these "no shows" did not include visits where Samantha canceled or failed to confirm in advance as required. Jones' email also stated that the "biggest issue" was "Samantha's demeanor and attitude toward supervisory staff, as well as the family support workers"; numerous workers refused to work with Samantha because of "the behavior, harassment, and profanity that they constantly receive"; and workers "had to actually block Samantha's number/email address as the

- 117 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
32 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF JESSALINA M.
Cite as 32 Neb. App. 98

messages would continue all day and night." The company did not feel that it was in the interests of its employees to subject them to Samantha's behavior.

The visitation notes from Independence Rising show that Samantha fed, changed, and played appropriately with Jessalina during visits. However, on cross-examination, Jones stated that when Samantha would no-show on her visits, it was "very hard on Jessalina having been transported all that way" to then have no visit. Also, one worker mentioned multiple times that any time she would help to redirect Samantha, she was fearful of the response she would get, and the worker also got emails from Samantha at 4 a.m. that were difficult for the worker. Jones herself received inappropriate emails from Samantha outside of visits.

### (iii) December 2021 to January 2022 Visitation

A new visitation provider was utilized in December 2021, and Samantha attended a majority of her visits, although she was late on several occasions. Ruiz acknowledged being contacted by Samantha's counsel, who had concerns about the relationship between the male visitation worker and Samantha and thought that maybe they were "getting along a little too well." Then on December 27, Samantha called law enforcement during her visit; along with a police officer, two "CFS" workers also went to the location of the visit. According to Ruiz, Samantha was holding Jessalina and putting her in an unsafe situation when the workers were trying to take Jessalina so law enforcement could continue their investigation. The police officer did not arrest anyone. Ruiz acknowledged that the visitation worker and Samantha gave different versions of what transpired during the visit. After that visit, Ruiz arranged for a different visitation worker to supervise the visits. Exhibits received into evidence show that Samantha attended another visit in December with a new supervision worker, but in January 2022, she missed all six of

- 118 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
32 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF JESSALINA M.
Cite as 32 Neb. App. 98

her scheduled visits through January 12; she failed to confirm four of those visits, confirmed but failed to show for another visit, and canceled due to illness for the other visit.

### (iv) February 2022 Change
### to Video Visits

On February 2, 2022, the juvenile court entered an order for video visits only. Ruiz testified that the court ordered all visits to occur virtually because of Samantha's "no-shows" and because she had not updated her psychological evaluation. Video visits were scheduled to occur three times each week for 15 minutes per visit. Samantha missed all 10 of her scheduled visits for February 2022 because she failed to confirm; in March, she missed her first video visits, but then attended 6 of her 8 remaining visits scheduled that month; in April, she attended 8 out of 13 scheduled visits; in May, she attended 10 out of 13 scheduled visits; and in June, she attended 11 out of 13 scheduled visits. During the termination trial, Samantha attended only three out of eight scheduled visits between the July 20 and August 12 hearing dates, and she missed both of her scheduled visits between the August 12 and 19 hearing dates. According to Ruiz, Samantha could have reestablished in-person visits at any point by completing an updated psychological evaluation, and Ruiz believed Samantha's failure to do so was an indication of her unwillingness to work on the case plan goals.

### (e) Jessalina's Father

Jose testified that his divorce from Samantha was finalized in 2021 and that Jessalina was placed with him in the middle of January 2022. Samantha sent messages to Jose asking him to let her see Jessalina without DHHS' knowledge, but he did not respond. Jose said that Samantha also sent him threatening text messages saying that she was "going to explode me up" and that she was coming after Jessalina. Jose was concerned about the messages because Jessalina was with him all the

- 119 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
32 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF JESSALINA M.
Cite as 32 Neb. App. 98

time. He supported terminating Samantha's parental rights to Jessalina.

We note that during Jose's testimony, Samantha repeatedly interrupted. The juvenile court informed her that if she continued to interrupt, she would be excluded from the hearing. Samantha told the judge that she could not be excluded from her own hearing and that the judge was allowing people to lie on the stand. The court informed Samantha that she could be excluded if she interrupted and that she had two attorneys representing her with whom she could visit. When Jose continued a response, Samantha interrupted again and told him to "shut [his] mouth." The court asked Samantha's GAL if she wanted to visit with Samantha and to suggest that she not interrupt anymore. Samantha said, "No, I don't need suggestion. I am tired of dealing with the false allegations . . . that constantly — like, I am tired of it." Her counsel asked if there was a way for the moderator to mute Samantha on "Zoom," and the clerk informed the court that the moderator had been muting her, but that Samantha was unmuting herself.

Jose was asked what his concerns were if the juvenile court did not terminate Samantha's parental rights. He responded, "[A]s you can see just a few minutes ago, just outbursts and whatnot." Jose stated that Samantha did not abide by anybody's rules except her own. During his marriage to Samantha, she said that Noah was no longer with her because "they kidnapped him for no reason." She also accused Jose of kidnapping Jessalina. Samantha "manipulates situations and scenarios."

#### (f) Samantha's Witnesses

Kourtney Sabala, a psychiatric mental health nurse practitioner, was called as a witness for Samantha. Sabala testified that Samantha has been her patient since January 2021, and Sabala provides medication management for her. According to Sabala, Samantha was diagnosed with "attention hyperactive

deficit disorder," post-traumatic stress disorder, and major depressive disorder; she has one medication for "ADHD," and a second medication helps treat the other diagnoses. Sabala received regular requests for Samantha's medication to be refilled, and Samantha appeared for followup appointments. Sabala had not diagnosed Samantha with bipolar disorder.

Sandra Raney was also called as a witness for Samantha. Raney testified that she has a master of arts degree in counseling and a master's degree in addictions counseling; is an addictions alcohol and drug counselor; and is a licensed mental health professional, a certified professional counselor, a certified anger resolution therapist, and a clinically certified trauma professional. Raney never met Samantha or Jessalina. Raney reviewed Dr. Kimzey's evaluation, visitation notes from January and September 2021, and some of the exhibits in the record.

What stood out for Raney was that Samantha was very attentive to Jessalina, and when Samantha was emotionally dysregulated, she separated herself from the child "which was insightful on her part"; additionally, it was not reported that Samantha had become aggressive with Jessalina. When asked if 15-minute video visits were actually meaningful, Raney replied, "[T]hey are conversating," and "[t]hat is a very meaningful thing." If Samantha is missing visits because she overslept, it could be an issue with medications throwing off her sleep schedule; on cross-examination, Raney agreed that if sleep had been an issue for 2 years, it was fair to say that it was not being treated. Raney did not believe it was appropriate to say that Jessalina would be hurt by a relationship with Samantha until there was more information, and she believed that an evaluation of the parent-child interaction and attachments would be helpful. For Samantha and Jessalina to continue having a relationship even if Jose has the child, Samantha needs to do medication management and counseling, as well as prove she is taking care of herself as

demonstrated by her behaviors. Raney said, "So [Jose] needs to be able to see that by [Samantha's] behavior it is safe to allow the daughter to have short windows of opportunities or visits."

On cross-examination, Raney stated that Samantha "needs to get the mental health addressed . . . to continue to have the relationship with the daughter, but I don't believe it's fair to terminate her rights because of her mental health." Raney acknowledged that it would be important information if Samantha was ordered to do an updated psychological evaluation and refused to do so, and if she was ordered to do counseling and provide those records for verification. When asked if failing to do those things indicated that Samantha was not willing to address her mental health, Raney replied, "It's showing that she's afraid." When asked if it would be a problem if Samantha refused, screaming and yelling, to turn Jessalina over to law enforcement, Raney responded, "When you don't understand the effects of trauma and the response, what we have is minimal information because also what I've heard is there's possibilities that she has a deeper mental health issue that's going on," so "I can also see her being protective of the child because she feels there's a threat." When asked if she would expect some sort of improvement to be evident after 5 years with state aid and multiple agencies, Raney said, "Yes."

### 3. Juvenile Court's Decision

In a journal entry and order entered on August 29, 2022, the juvenile court found by clear and convincing evidence that statutory grounds for termination of Samantha's parental rights existed pursuant to § 43-292(2), (3), (5), (6), and (7). The court also found that Samantha was an unfit parent and that termination of her parental rights was in the child's best interests. Accordingly, the court terminated Samantha's parental rights to Jessalina.

Samantha appeals.

- 122 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
IN RE INTEREST OF JESSALINA M.
Cite as 32 Neb. App. 98

### III. ASSIGNMENTS OF ERROR

Samantha assigns, consolidated and restated, as follows: That in the county court for Lincoln County, (1) her constitutional rights were violated and the court erred when it transferred this juvenile case from its original jurisdiction to another jurisdiction, because the court denied her a meaningful opportunity to cross-examine witnesses when the GAL was excused from the hearing and because the court dismissed her court-appointed attorneys before a hearing or ruling on a previously scheduled contested hearing on her objection to a DHHS court report and case plan. That the county court for Cheyenne County erred (2) in finding that grounds for terminating her parental rights existed pursuant to § 43-292(2), (3), (5), (6), and (7); and (3) in finding that she was unfit and that terminating her parental rights was in Jessalina's best interests.

### IV. STANDARD OF REVIEW

[1,2] An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *Id.*

### V. ANALYSIS

#### 1. Transfer to Cheyenne County

Samantha argues that her "Due Process and Constitutional rights were violated, and the trial court erred when the Lincoln County Court transferred this Juvenile case from its original jurisdiction." Brief for appellant at 17. Specifically, that "[t]he court dismissed Samantha's court appointed attorneys and denied Samantha's meaningful opportunity to confront accusers or cross examine witnesses, before hearing or ruling

- 123 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
IN RE INTEREST OF JESSALINA M.
Cite as 32 Neb. App. 98

on a previously scheduled contested hearing on Samantha's Objection" to a DHHS court report and case plan. *Id*.

### (a) Principles of Law

Section 43-282 states in relevant part:

> If a petition alleging a juvenile to be within the jurisdiction of the Nebraska Juvenile Code is filed in a county other than the county where the juvenile is presently living or domiciled, the court, at any time after adjudication and prior to final termination of jurisdiction, may transfer the proceedings to the county where the juvenile lives or is domiciled and the court having juvenile court jurisdiction therein shall thereafter have sole charge of such proceedings and full authority to enter any order it could have entered had the adjudication occurred therein.

See, also, *In re Interest of Jeremy U. et al.*, 304 Neb. 734, 936 N.W.2d 733 (2020) (§ 43-282 allows proceedings to be transferred, after adjudication, to county where juvenile lives or is domiciled); *In re Interest of Tegan V.*, 18 Neb. App. 857, 794 N.W.2d 190 (2011) (§ 43-282 allows adjudication proceeding to be filed in any county and allows for discretionary transfer, after adjudication, to county where juvenile is living or domiciled).

### (b) Procedural Background

On June 17, 2021, several months after Jessalina was adjudicated, her GAL filed a motion to transfer the case to Cheyenne County pursuant to § 43-282. The contents of the motion and Samantha's response were set forth earlier in this opinion.

At the June 30, 2021, hearing on the motion to transfer, the juvenile court stated that although the strict rules of evidence did not apply and it was a discretionary matter for the court under § 43-282, it would receive evidence. The court also stated that Jessalina's GAL was excused from the hearing but

- 124 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
32 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF JESSALINA M.
Cite as 32 Neb. App. 98

was authorized to present evidence by affidavit; that affidavit was received into evidence without objection. The affidavit reiterated the reasons set forth in the GAL's motion to transfer regarding the location of all relevant persons; that all visitations occurred outside of Lincoln County, with the majority occurring in Cheyenne County; Samantha had a recently expired domestic abuse protection order against Jose in Cheyenne County; Samantha and Jose had a divorce proceeding pending in Cheyenne County; the May 4, 2021, DHHS court report set forth the history of the case and showed the lack of meaningful contact with Lincoln County; and Jose had progressed significantly toward reunification with Jessalina as compared to Samantha and "placement should occur with him as the case closes down." Numerous exhibits were attached to the affidavit.

A report from Samantha's GAL was also received into evidence. This report stated that Samantha lived in North Platte, where she had moved while pregnant with Jessalina because Jose was physically abusive; her therapist and doctors were in North Platte; she was already required to travel for visits with Jessalina, and such travel interfered with Samantha's mental health and her ability to look for employment; and the travel created obstacles to her ability to parent. Also received into evidence was a March 18, 2021, letter from Samantha's therapist recommending that Samantha's visitations be held outside of Sidney because of trauma Samantha experienced there; the trauma led to a diagnosis of post-traumatic stress disorder, and putting Samantha near the place her trauma occurred was not in her best interests. A visitation schedule showed that Samantha was scheduled to have visits in Ogallala and North Platte. Upon inquiry by the juvenile court, Samantha's counsel confirmed that none of Samantha's visits were occurring in Sidney.

The State argued that it was in favor of a transfer to Sidney because in Sidney they have "a lengthy background" with Samantha and terminated her parental rights

- 125 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
32 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF JESSALINA M.
Cite as 32 Neb. App. 98

previously, witnesses testifying on behalf of the State would primarily be in the Sidney area if there was a parental termination, Jessalina had been in Sidney the "entire time" except for a few days, and Jessalina's father was in Sidney. DHHS concurred and also requested that the case be transferred to Cheyenne County. DHHS noted that the case manager and supervisor for the case would remain the same, so there would not be any interruption in case management. Jose's counsel stated that Jose agreed with the transfer.

Samantha's GAL argued that it appeared that the reason for seeking a transfer was to immediately file for a termination of Samantha's parental rights. Her GAL added that "it's certainly clear to anybody who's participated that Samantha has been frustrated and angry at times," and "it is also no secret that she has some mental health issues," specifically post-traumatic stress disorder and "ADHD." But "rather than aiding her, it has . . . been like a hammer against her." Traveling for all of her visits "posed a serious problem" (e.g., holding a job and being on time for visits).

Samantha's attorney was "concerned about the timing of this being solely an effort to get this somewhere where someone will do something to terminate [Samantha's] rights." Counsel argued that Samantha's caseworker, other providers, and her appointed attorneys that she had for 8 months would change if the case were transferred to Cheyenne County. As for witnesses, Samantha's psychiatrist, therapist, and physician were "here," she had support workers in North Platte, and her caseworker's supervisor was in North Platte. Counsel argued that a transfer would further delay a hearing on Samantha's objection to the May 4, 2021, case plan. Counsel stated, "I think that if ever there was an appropriate time to transfer this case it was immediately following the adjudication," and "[i]t's not now" as it would be prejudicial to Samantha, not to mention costly to the judicial system and inefficient. Counsel said that she "just can't see the need

- 126 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
32 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF JESSALINA M.
Cite as 32 Neb. App. 98

to transfer" this case and that "[i]t's completely within the court's discretion."

The juvenile court entered its order on July 2, 2021, transferring the matter to Cheyenne County. The court noted that Jessalina had lived in Cheyenne County since September 2020 and that the proceedings had transitioned past the adjudication phase for both parents. All parties except Samantha "have joined in or agreed to the [GAL's] request to transfer jurisdiction," and the GAL's affidavit "points out that the transfer would be in the best interest of the minor for a variety of reasons." The court stated, "It should be noted that if a transfer would take place, virtually no interruption of services will occur, nor will the mother's visitation be disrupted." The court did "not disagree that the mother suffers from serious mental health issues and that special care must be taken if a transfer were granted to accommodate her needs"; "[h]owever, the issue isn't whether the transfer of this Court's jurisdiction is in the best interest of the mother but the best interest of the child." The court said that Samantha's concerns could be accommodated by virtual court appearances if medically necessary and continued visitations outside of Sidney. The court also deferred the contested review hearing on the court report and case plan.

### (c) Transfer Was Proper

Initially, we note that Samantha claims that "[b]ecause the trial court excused Jessalina's GAL [from the transfer hearing], Samantha could not confront her accuser." Brief for appellant at 21. However, at the transfer hearing, Samantha neither objected to the GAL being excused nor the receipt of the GAL's affidavit into evidence; she therefore waived any argument regarding her right to confront the GAL. And regardless, Samantha's GAL, as well as Samantha's attorney, made numerous arguments to counter the points made by Jessalina's GAL in support of transferring the case.

- 127 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
32 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF JESSALINA M.
Cite as 32 Neb. App. 98

Samantha also contends that the transfer was prejudicial to her because it caused a delay in the contested hearing regarding DHHS' May 4, 2021, court report and case plan. However, Samantha continued to be provided with services and visitation until the contested hearing was held in Cheyenne County on September 21, 2021. At the hearing, Samantha's lawyer asked the court not to adopt the May 4 plan and to have DHHS rewrite the case plan to leave out the adoption language and to acknowledge "things" that Samantha had done.

Samantha's GAL also said the "adoption" language (concurrent plan) should be redacted. Jessalina's GAL asked the court to adopt the plan, but understood the plan was now 4 months old and needed an update, and suggested they come back in 30 days. The State said it was "not entirely sure what the objection was" other than the concurrent plan of adoption. Following the hearing, the juvenile court modified the DHHS court report and case plan "to eliminate Adoption as an alternative to reunification at this time," and approved the court report and case plan "as modified."

It appears that Samantha's objection to the case plan dated May 4, 2021, was the language concerning an alternative plan of adoption, and that language was "eliminated" by the juvenile court as requested. The May 4 DHHS case plan contained identical case plan goals and strategies for Samantha as appeared in the February 17 plan; the only difference was that the May plan contained updates on Samantha's progress. Additionally, the subsequent case plan dated November 2, 2021, was approved by the court on November 30 over Samantha's objections. The November 2 plan once again contained identical case plan goals and strategies for Samantha as appeared in the previous plans, with the only difference being updated progress notes. Given the foregoing, we fail to see how Samantha's rights were violated or how she was prejudiced by the transfer of the case to Cheyenne County. We find no error in the juvenile court's decision to transfer the case.

- 128 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
IN RE INTEREST OF JESSALINA M.
Cite as 32 Neb. App. 98

## 2. Statutory Grounds
### for Termination

The State and Jessalina's GAL sought to terminate Samantha's parental rights to Jessalina under § 43-292(2), (3), (5), (6), and (7). The juvenile court found that all five of those grounds existed by clear and convincing evidence.

[3] Section 43-292(7) allows for termination when "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." By the plain and ordinary meaning of the language in § 43-292(7), there are no exceptions to the condition of 15 out of 22 months' out-of-home placement. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). Section 43-292(7) operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Mateo L. et al., supra*. In other words, if the period of 15 out of 22 months is met, § 43-292(7) is met. See *In re Interest of Mateo L. et al., supra*.

[4] Section § 43-292(7) does not specifically provide a triggering event for when the 22-month look-back period should commence. Compare § 43-292(1) (termination of parental rights allowed when parents have abandoned juvenile for 6 months or more immediately prior to filing of petition). Notably, however, to terminate parental rights under § 43-292(7), it must be alleged in the petition or motion to terminate parental rights that the juvenile has been in an out-of-home placement for 15 or more months of the most recent 22 months. See Neb. Rev. Stat. § 43-291 (Reissue 2016) (facts alleging grounds for termination of parental rights set forth in original petition, supplemental petition, or motion for termination of parental rights). Thus, the logical conclusion is that the filing of the petition, supplemental petition, or motion to terminate parental rights is the triggering event for the 22-month look-back period described in § 43-292(7). See, also, Neb. Rev. Stat. § 43-292.02 (Cum. Supp. 2022)

- 129 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
32 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF JESSALINA M.
Cite as 32 Neb. App. 98

(petition shall be filed on behalf of State to terminate parental rights of juvenile's parents if juvenile has been in foster care under responsibility of State for 15 or more months of most recent 22 months; exceptions provided). The Nebraska Supreme Court has also used the filing date of the petition when considering § 43-292(7). See, *In re Interest of Nicole M.*, 287 Neb. 685, 844 N.W.2d 65 (2014) (at time State filed to terminate parental rights, children had been in out-of-home placement for over 21 months; sufficient evidence under § 43-292(7)); *In re Interest of Shelby L.*, 270 Neb. 150, 699 N.W.2d 392 (2005) (child in continuous out-of-home placement for 15 months 12 days when termination petition filed; if this were only ground for termination, only question would be whether termination was in child's best interests).

Jessalina was removed from Samantha's care and custody on September 10, 2020, while she was still in the hospital after her birth, and Jessalina never returned to Samantha's home. Jessalina was placed with her father on January 10, 2022. Assuming without deciding that the time Jessalina was placed with her father did not count as an out-of-home placement for purposes of § 43-292(7), Jessalina had been in an out-of-home placement for 16 months from September 10, 2020, until January 10, 2022. The "complaint" to terminate Samantha's parental rights was filed on March 25, 2022. Therefore, the 22-month look-back period would run from May 25, 2020, to March 25, 2022, which includes the 16 months of out-of-home placement from the time of Jessalina's removal until she was placed with her father. Further, even when looking back at the most recent 22 months preceding the July 20, 2022, commencement of the parental termination hearing (September 20, 2020, to July 20, 2022), Jessalina had been in an out-of-home placement for 15 of those 22 months as of December 20, 2021.

The State has shown clearly and convincingly that § 43-292(7) exists as a statutory basis for terminating the parental rights of Samantha. And since any one of the bases

- 130 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
32 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF JESSALINA M.
Cite as 32 Neb. App. 98

for termination codified in § 43-292 can serve as the basis for termination, we need not consider the sufficiency of the evidence concerning any other statutory basis for termination. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). We next consider whether termination is in the child's best interests.

### 3. BEST INTERESTS AND UNFITNESS

[5-7] Under § 43-292, once the State shows that statutory grounds for termination of parental rights exist, the State must then show that termination is in the best interests of the child. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). A child's best interests are presumed to be served by having a relationship with his or her parent. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). This presumption is overcome only when the State has proved that the parent is unfit. *Id.* Although the term "unfitness" is not expressly stated in § 43-292, the Nebraska Supreme Court has said that it derives from the fault and neglect subsections of that statute and from an assessment of the child's best interests. *In re Interest of Mateo L. et al., supra.* In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *In re Interest of Leyton C. & Landyn C., supra.* The best interests analysis and the parental fitness analysis are separate inquiries, but each examines essentially the same underlying facts as the other. *Id.* We have previously set forth the evidence presented at the termination hearing, and we will not recount it again here.

Notably, the same issues that were present in the previous case with Noah were again present here in that Samantha failed to address her mental health issues and failed to make progress on case plans. In the current case, DHHS

- 131 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
IN RE INTEREST OF JESSALINA M.
Cite as 32 Neb. App. 98

provided numerous services to Samantha, including family support with two different agencies, supervised visitation with three different agencies, makeup visitation, "Zoom" visits, home visits, case management, team meetings, hotel vouchers, gas vouchers, transportation, and assistance with time management; she failed to utilize all of the services provided to her. Additionally, Samantha failed to sign releases for DHHS to access counseling and medical records, DHHS was only provided a partial copy of Dr. Kimzey's evaluation, and Samantha failed to complete an updated evaluation; all of these things inhibited DHHS' ability to help Samantha. Samantha's failure to utilize or engage in services, and her failure or inability to work with the providers who were trying to help her, inhibited her ability to reunify with Jessalina.

While Samantha's visits with Jessalina were generally good when they occurred, they did not occur consistently. She even missed visits that were to occur in North Platte and would not have required her to travel. And Samantha never progressed beyond supervised visitation. Jessalina had been out of Samantha's care for 22 months at the time the termination hearing commenced in July 2022. Samantha had not seen Jessalina in person since January, and from February to August, they only had three 15-minute video visits scheduled each week, because Samantha had not obtained an updated psychological evaluation. Samantha missed many of the video visits, as described previously.

[8] "Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity." *In re Interest of Walter W.*, 274 Neb. 859, 872, 744 N.W.2d 55, 65 (2008). And where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Ryder J., supra*. The State proved that Samantha was unfit, meaning that she has a personal deficiency or incapacity which has prevented, or will prevent, performance of a reasonable parental obligation in child

- 132 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
32 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF JESSALINA M.
Cite as 32 Neb. App. 98

rearing and which has caused, or probably will result in, detriment to the child's well-being. See *In re Interest of Leyton C. & Landyn C., supra*. We further find that there is clear and convincing evidence that it is in Jessalina's best interests to terminate Samantha's parental rights.

## VI. CONCLUSION

For the reasons stated above, we affirm the order of the juvenile court terminating Samantha's parental rights to Jessalina.

AFFIRMED.